IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>LAWRENCE HENDERSON, and KENDALL MILLER,<br><br>Defendants. | 8:18CR312<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on motions to suppress filed by Defendant Kendall Miller ("Miller") and Defendant Lawrence Henderson ("Henderson") (collectively "Defendants"). (Filing Nos. 27 and 34.) The motions arise from a traffic stop of a semi and trailer which occurred on August 28, 2018. Miller, who was the driver of the semi, challenges the basis for the stop, the duration of the stop, and the search of the semi and trailer.[1] Henderson, who was the passenger, was granted leave to adopt the pre-hearing brief submitted by Miller. Henderson asserts the same arguments as Miller, but also challenges the reliability of the K-9 used to sniff the semi and trailer, which he has standing to do as the owner of the semi and trailer. (Filing No. 37.)

A hearing on the motions was held on May 9, 2019, and a transcript of the proceedings was filed on May 21, 2019. This matter is now ripe for disposition. For the reasons explained below, it will be recommended that the motions be denied.

---

[1] An individual who lacks an ownership interest in a stopped vehicle does not have standing to directly challenge the search of the vehicle. *See United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001). The passenger may, however, contest the lawfulness of his own detention and seek to suppress evidence as the fruit of his illegal detention. *Id*. Miller argues that he has standing to directly challenge the search of the semi because he has a reasonable expectation of privacy in a vehicle he was driving in the normal course of his employment. Miller cites to two cases that do not stand for this proposition.

# FACTS

On August 28, 2018, at approximately 11:23 a.m., Nebraska State Patrol Trooper Samuel Mortensen ("Trooper Mortensen") was traveling west on I-80 near mile marker 301 in Hall County, Nebraska, when he observed a white semi pulling a white trailer traveling east.[2] (TR.11-12.) As the semi passed him, Trooper Mortensen noticed that there appeared to be two individuals in the semi. (TR. 11-12.) Trooper Mortensen testified that it is uncommon to see two individuals seated in a cab of a commercial vehicle. (TR. 35.) As the semi went by, Trooper Mortensen noticed there was not a license plate on the rear of the trailer. (TR. 13.) Trooper Mortensen turned his cruiser around and initiated a traffic stop. (TR. 13.) A video of the traffic stop was recorded by Trooper Mortensen's body camera. (Ex. 1.)

As he approached the semi to speak to the occupants, Trooper Mortensen observed that the rear of the trailer displayed the company name, DOT number and MC number. (TR. 13.) Trooper Mortensen testified that the presence of the DOT number on the trailer piqued his interest because it is not required by the Federal Motor Carrier Regulations and would have been an added expense for the company to put that marking on the trailer. Trooper Mortensen stated that, generally, trucking companies try to avoid unnecessary expenses because the margin of profit in the trucking industry is very narrow. (TR. 13-14.) Trooper Mortensen also noticed that there was a temporary tag where the license plate should have been. (TR. 13.) He further noted that it looked like there was fresh or new paint around the rear of the trailer and around the axles. (TR. 13.) Trooper Mortensen testified that he believed this indicated that the trailer was new or recently-sold. (TR. 14.) Trooper Mortensen also noticed that it appeared that the semi had newer tires on the drive axles. (TR. 13.)

Trooper Mortensen first made contact with Henderson, who was seated in the passenger's seat. (TR. 13.) Miller, who had been driving the semi, was seated in the driver's seat. (TR. 18.) Trooper Mortensen advised Defendants of the reason for the stop and requested to see the

---

[2] Trooper Mortensen is a certified carrier enforcement officer, whose primary duties include commercial vehicle enforcement. (TR. 9-10.)

registration documents for the semi and Miller's driver's license. (TR. 15.) At this time, Trooper Mortensen noticed that there were several pine-tree-style air-fresheners throughout the cab of the semi. (TR. 15.) Some of the air-fresheners were hanging and others were tucked into storage compartment areas. (TR. 15.) Defendants produced the registration, lease agreements, and insurance information. (TR. 18.) The documents revealed that the purchase date of the trailer was August 23, 2018. (TR. 18.)

Trooper Mortensen informed Defendants he was going to perform a level two inspection. (TR. 15-16.) A level two inspection is a walk-around inspection of a commercial vehicle, which includes an inspection of lights and mechanical items, such as windshield wipers, air hoses, turn signals, and taillights. (TR. 10-11; TR. 17.) A level two inspection also includes a visual inspection of the undercarriage of the vehicle and examination of the tires. (TR. 17.) Trooper Mortensen testified that it is his general practice to do a level 2 or 3 inspection whenever he stops a commercial vehicle. (TR. 35.)

After he completed the level 2 inspection, Trooper Mortensen told Defendants he was going to prepare an inspection report. (Ex. 1.) At that point, he asked Miller to accompany him to his cruiser. (Ex. 1.) As Miller was exiting the semi, Trooper Mortensen requested Miller's log book. (TR. 18-19.) A log book is used for drivers to track their hours of service, which involves off-duty time, sleeper-berth time, and driving time. (TR. 18.) Each driver must have his own log book. (TR. 28.) Trooper Mortensen testified that log books are necessary because the Federal Motor Carrier Regulations limit the amount of time that a driver can drive in a given period, as well as the amount of time that they can drive while being on-duty. (TR. 18-19.) Depending on the year of the semi, log books can either be in paper or electronic. (TR. 18.) In this instance, the log book was electronic. (TR. 19.) Trooper Mortensen was able to view the log book by using Henderson's smart phone and then emailing a copy of the log book to himself. (TR. 19.) Trooper Mortensen observed that the log book showed that there were several days of off-duty time prior to August 25, 2018 when the drive-time began. He noted that there was a significant amount of down time in the Salt Lake City, Utah area. (TR. 19.) Trooper Mortensen also noticed that there was a short amount of on-duty driving time before there was off-duty time again, and then it showed driving from Salt Lake City to the North Platte area. (TR. 20.)

After he examined the log book, he asked Henderson about their trip. (TR. 20.) Henderson told him that they were coming from California. Henderson said they had dropped part of a load in Salt Lake City and that they were headed to drop the remainder of the load in Ohio. (TR. 20; Ex. 1.) Henderson provided Trooper Mortensen with his driver's license and also offered to show Trooper Mortensen what was in the trailer. (TR. 21; Ex. 1.)

After this conversation with Henderson, Trooper Mortensen returned to his cruiser with Miller. (Ex. 1.) When they were in the cruiser, Trooper Mortensen began to further examine the paperwork and ran background checks on Defendants. (Ex. 1.) Trooper Mortensen learned that Miller had a valid commercial driver's license out of Ohio. (TR. 38.) He also learned that Miller had a criminal history for assault and that Henderson had a prior drug charge. (TR. 23-24.)

While they were in the cruiser, Trooper Mortensen inquired further about their trip. (TR. 21.) Miller told Trooper Mortensen that they picked-up the load in California, but he could not recall exactly where, and that they were taking the load to Columbus, Ohio. (TR. 21.) Miller told Trooper Mortensen that this was his first trip for the company. (TR. 22-23; Ex. 1.) Trooper Mortensen asked Miller if they had taken a load to California, and Miller said they had not. (TR. 22.) Trooper Mortensen asked Miller if they had flown to California, and then Miller changed his story and said that they had taken a load to California with a different truck. (TR. 22.) Trooper Mortensen thought this was significant because it is not common practice to change trucks in California. (TR. 22-23.) Trooper Mortensen further testified that he thought he could smell the odor of burnt marijuana on Miller, but he was not completely sure. (TR. 39.) Trooper Mortenson stated that Miller was calm and relaxed in the cruiser and answered all questions. (TR. 39.)

Trooper Mortensen left the cruiser to return Henderson's license. (Ex. 1.) Trooper Mortensen again asked Henderson about their travel plans. Henderson told Trooper Mortensen that they had driven a different truck to California with a different load, and then had changed companies. (TR. 24.) Henderson explained that he did not have any prior driving time on his log book because the other company that he drove for had a different log book system. (TR. 24-25.)

4

Trooper Mortensen returned to the cruiser to complete the inspection report. He returned Miller's paperwork and told Miller he was free to go. (TR. 26.) Trooper Mortensen testified that at this point, the reason for the traffic stop was complete. (TR. 41.) As Miller was beginning to exit the cruiser, Trooper Mortensen asked Miller if there was anything illegal in the semi and if he was still willing to consent to him looking inside the trailer. (Ex. 1; TR. 26.) Miller told Trooper Mortensen that he was just the driver and he had to ask Henderson for consent to search. (Ex. 1; TR. 26.) Trooper Mortensen told Miller to wait in the cruiser while he went to speak to Henderson. (TR. 42.) Trooper Mortensen testified that Miller was not free to leave at that point. (TR. 42.)

Around this time, Trooper Matt Adams ("Trooper Adams") arrived on the scene. As Trooper Mortensen left the cruiser to speak to Henderson, he asked Trooper Adams to talk to Miller to see if he could smell marijuana. (TR. 27.) Trooper Mortensen then contacted Henderson and requested consent to search the semi and trailer. (TR. 27.) Trooper Mortensen explained that some things about Defendants' travel piqued his interest. (Ex. 1.) Trooper Mortensen and Henderson continued to discuss whether Henderson would consent to a search of the trailer and cab. Trooper Mortensen explained that many individuals run various forms of contraband on that particular road and that often these individuals have legitimate paperwork. Trooper Mortensen explained that based on what he has seen in the past, Defendants' recent pick up of the new trailer and the recentness of Defendants' documents is similar to the way a criminal enterprise is run. (Ex. 1.)

Henderson acknowledged that the trailer was just picked up and is new, but that he had the truck and had gone coast to coast in the truck. (Ex. 1.) Henderson explained he was going back to California to get the license plate and since they had all of their paperwork, he did not understand why this was raising a flag. (Ex. 1.) Trooper Mortensen again explained that most individuals in a criminal enterprise have all of their documents and the recentness of Henderson's documents was peaking his suspicion. (Ex. 1.) Henderson indicated the level two inspection was good and he wanted to be able to head-down the road. Henderson stated that he had never had his personal truck searched since he has been in the industry. (Ex. 1.) Henderson further stated that he did not think there was probable causes to search the semi. (Ex.1.) Trooper Mortensen explained that he did not have probable cause and that is why he was asking for consent to search. (Ex. 1.) At this

5

point, Henderson gave Trooper Mortensen consent to search the trailer, but not the cab of the semi. (TR. 27.)

Trooper Mortensen had Henderson exit the semi and requested a K-9 through dispatch. (TR. 27.) Trooper Mortensen then conducted a search of the trailer. (TR. 27.) Trooper Mortensen's search of the trailer did not uncover any contraband. (TR. 43.) Once the search of the trailer was complete, Trooper Mortensen informed Henderson that he was going to prepare a receipt for the search. (TR. 43.) He also told Henderson that a K-9 was going to come to double-check the trailer. (TR. 43.)

Trooper Mortensen returned to his cruiser to prepare the receipt. Miller was still in the cruiser at that point. As he was completing the receipt, Trooper Mortensen used the computer in his cruiser to see how long it would be before the K-9 arrived. (TR. 54.) Once the receipt was complete, Trooper Mortensen returned Miller's documents and provided him with a copy of the receipt to sign. (TR. 44; Ex. 1.) As Trooper Mortensen was preparing to scan the signed receipt, he noticed that the log book he examined actually belonged to Henderson, not Miller. (TR. 28.) Trooper Mortensen requested Miller's log book. (TR. 29.) Miller stated that he did not have one and was operating under Henderson's book. (TR. 29.) Trooper Mortensen testified that this constituted a false log and was an out-of-service violation. (TR. 29.) Trooper Mortensen thought this was suspicious because if Miller was actually an over-the-road truck driver, he would have a log-in or be able to produce some sort of log device. (TR. 29.)

Trooper Mortensen left the cruiser and explained the issue with the log book to Henderson. (TR. 30.) Trooper Mortensen told Henderson that he needed to drive, and that Miller had to create a profile on the logging device before he drove again. (TR. 30.) Trooper Mortensen also informed Henderson that he was not going to issue a citation or violation for the logging device because he understood Miller was training. (TR. 30.)

As Trooper Mortensen was beginning to speak to Henderson about the log book violation, Trooper Brent Potthoff ("Trooper Potthoff") arrived on the scene with his K-9. (TR. 30.) After Trooper Mortensen informed Henderson he was not going to issue a citation, Trooper Mortensen

6

spoke to Trooper Potthoff. (TR. 30.) Trooper Mortensen told Trooper Potthoff that he had some indicators of criminal activity and that he was granted consent to search the trailer but not the semi. (TR. 30.) Trooper Mortensen told Trooper Potthoff to run the dog around the entire vehicle but to focus on the cab area of the semi. (TR. 55-56; Ex. 1.) Trooper Potthoff then deployed his certified K-9, Amos. (TR. 30; TR. 61.) Trooper Potthoff testified that Amos was first certified on April 4, 2018. (TR. 67.)

Amos alerted to the odor of narcotics around the driver's side back of the trailer and continued to alert around to in front of the rear tires about halfway up the passenger side of the trailer before he indicated to the odor of narcotics. (TR. 63-64.) Trooper Potthoff testified that it was windy that day and that the wind was coming from the front driver's side of the semi towards the back passenger's side of the trailer. (TR. 64-65.) Trooper Potthoff stated that wind can affect where dogs alert and indicate to odors. (TR. 64.)

Trooper Potthoff testified that K-9s are trained to indicate at the strongest source of the odor. (TR. 69.) When a K-9 does not indicate to the strongest source, this is referred to as "fringing." (TR. 69.) Trooper Potthoff testified that he believed Amos was fringing when he ran around the semi in this case. (TR. 74.) Trooper Potthoff stated that he believed the odor from the drugs was being carried by the wind against a part of the trailer, and that is why Amos indicated in that area. (TR. 74.)

After Amos alerted and indicated to the odor of narcotics, Trooper Potthoff told Trooper Mortensen that he had probable cause to search. (TR. 66.) Trooper Mortensen conducted a search of the semi cab and found several packages of marijuana. (TR. 30.) Trooper Mortensen then placed Miller and Henderson under arrest. (TR. 30.) Trooper Mortensen continued to search the cab, while waiting for the tow truck. Trooper Mortensen found several kilo-sized packages of white-ish unknown powder. (TR. 31; Ex. 1.) These tested positive for cocaine and methamphetamine. (TR. 32.) The semi and trailer were towed to the Nebraska State Patrol's office in Grand Island, Nebraska. (TR. 31-32.)

## DISCUSSION

**1.    Stop of the Vehicle**

"A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation." *United States v Andrews* 454 F.3d 919, 921 (8th Cir. 2006). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Id*. "Courts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001).

The stop of the vehicle was lawful.  Trooper Mortensen pulled over the semi because he believed the trailer did not have license plates as required by Nebraska law. *See* Neb. Rev. Stat. § 60-376. It was not until Trooper Mortensen approached the trailer, on his way to talk to the occupants of the semi, that he observed what looked like a temporary tag where the license plate belonged. (TR. 13.) This is reflected in the video. However, from the video, it appears that the temporary tag was difficult to identify or read. The Eighth Circuit has made clear that even though a traffic violation had not, in fact, occurred, "[t]he determination of whether probable cause existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *United States v. Sanchez*, 572 F.3d 475, 478 (8th Cir. 2009) (quotation omitted). *See United States v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000) (finding that an officer's mistaken belief that a traffic violation had occurred did not negate probable cause for the traffic stop).

The Nebraska Supreme Court has likewise found that an officer's subsequent determination that a traffic violation had not occurred does not invalidate a traffic stop. *See State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019) (finding that officers had reasonable suspicion for traffic stop where they did not see license plates or visible in-transit tags before the stop, even though the in-transit tags became visible as they approached the stopped vehicle on foot). *See also State v. Bowers,* 250 Neb. 151, 160, 548 N.W.2d 725, 731 (1996) ("The proper focus of an inquiry is not whether specific conduct is criminal or noncriminal, but whether a police officer's suspicion is reasonably related to the activity observed, criminal or noncriminal") (internal quotation

omitted). Because Trooper Mortensen reasonably believed that the trailer was not displaying plates or in-transit sticker, there was probable cause for the stop.[3]

### 2. Duration of the Stop and Reasonable Suspicion

"After a law enforcement officer initiates a traffic stop, the officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016) (internal quotation omitted). These tasks generally include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (quotation omitted). When commercial vehicles are stopped, these routine tasks include gathering information regarding compliance with commercial carrier regulations. *See United States v. Maldonado*, 356 F.3d 130, 134 (1st Cir. 2004) ("A driver's license and registration are plainly routine documents that the police may review in the course of any highway stop . . . In the case of a commercial trucker, a medical certificate and a log book fall into the same category— they are documents that the trucker is legally required to possess").

Once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates reasonable suspicion to justify a further detention. *See United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998). "A dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing," and is not "an ordinary incident of a traffic stop." *Rogriguez*, 135 S.Ct. 1609, at 1615. Therefore, "an officer who has stopped a driver for a traffic-related violation may not extend the stop for a dog sniff absent the reasonable suspicion ordinarily demanded to justify detaining

---

[3] Moreover, Trooper Mortensen testified that any commercial motor vehicle is subject to inspection whenever it is involved in commerce on the roadway. Therefore, a semi and trailer may be stopped and inspected at any time. (TR. 16.) Once Trooper Mortensen had stopped the semi and trailer, he decided he would conduct an inspection because this is his protocol for any semi and trailer he stops. (TR. 16.)

9

an individual." *United States v. Nabavi*, No. 4:16CR3039, 2017 WL 1207877, at *5 (D. Neb. Feb. 13, 2017) (internal quotation omitted).

In order to establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant further investigation." *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016) (quotation omitted). Even though some factors may appear innocent if considered alone, "a combination of factors may give rise to reasonable suspicion." *United States v. Briasco*, 640 F.3d 857, 860 (8th Cir. 2011). In assessing the existence of reasonable suspicion, courts may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *Beck*, 140 F.3d at 1136 (quotation omitted). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994).

As discussed above, Trooper Mortensen initiated a valid traffic stop and was entitled to request and review the occupants' driver's licenses, vehicle registration, log book, as well as run background checks. Trooper Mortensen testified that the purpose of the traffic stop concluded when he returned Miller's documents. However, as Miller was leaving the cruiser, Trooper Mortensen asked if they had anything illegal in the truck or trailer and asked if he could still search the trailer. Miller responded to Trooper Mortensen by saying that he needed to obtain consent from Henderson. Miller did not say that he did not want to talk to Trooper Mortensen. Although Miller was instructed to stay in the cruiser while Trooper Mortensen went to ask for Henderson's consent to search, Trooper Mortensen was simply trying to determine whether he still had permission to search the trailer, as was previously provided by Henderson.

Defendants argue that Miller was detained, without reasonable suspicion, when Trooper Mortensen left to speak to Henderson. Thus, according to Defendants, Miller's detention was illegal and anything found from this point forward should be suppressed as fruit of the poisonous tree. This argument is unpersuasive.

10

"Not every encounter between law enforcement officers and an individual constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988). The Eighth Circuit has previously determined that consensual encounters are not transformed into seizures merely by officers leaving an individual in a police cruiser to speak to another person. In *United States v. Munoz,* 590 F.3d 916 (8th Cir. 2010), the Eighth Circuit found that when the officer told the driver of a vehicle to remain in the police cruiser while the officer went to speak to the passenger, the consensual encounter was not transformed into a seizure. In *Munoz*, as in this case, the defendant, while seated in the cruiser, told the officer following completion of the traffic stop that he should ask the passenger for consent to search. *See also United States v. McManus,* 70 F.3d 990, 992–93 (8th Cir. 1995) (finding that an officer's direction to come back and have a seat did not transform consensual encounter into seizure); *United States v. Angell*, 11 F.3d 806, 809–10 (8th Cir. 1993) (stating that officer's statement to "stay there" or "hold it right there" did not transform consensual encounter into seizure), *abrogated on other grounds as recognized by United States v. McKinney*, 120 F.3d 132, 133 (8th Cir. 1997). Miller was not seized while Trooper Mortensen spoke to Henderson about consent to search the trailer and semi.

After receiving Henderson's consent to search the trailer, Trooper Mortensen performed the search. Upon the search's completion, Trooper Mortensen told Henderson that he would give him a receipt for the search. As he was finalizing the receipt by scanning Miller's signature, Trooper Mortensen noticed a problem with the log book. At the time the K-9 arrived on the scene, Trooper Mortensen was in the process of discussing the log book issue with Henderson. He was completing the process of a consensual search and resolving a later-discovered issue with documents provided during the initial traffic stop. Even though Trooper Mortensen did look at his computer to check the location of the K-9 officer, there is nothing to indicate that Trooper Mortensen used delay tactics to extend the stop to obtain the K-9 sniff.

The drug dog arrived while Trooper Mortensen was speaking to Henderson regarding the log book violation. Trooper Mortensen indicated to Henderson that he was not going to write him a ticket and that he would be free to go after the K-9 was run around the cab and trailer. At this point, the purpose of traffic stop was completed. Thus, as provided under *Rodriguez,* the officers

11

could not extend the traffic stop to run the K-9 around the semi and trailer without reasonable suspicion.

Defendants contend that reasonable suspicion of criminal activity did not develop during the traffic stop to justify their continued detention for a K-9 sniff.  Trooper Mortensen observed that (1) two individuals were riding in the cab of the semi; (2) there was fresh or newer paint around the rear of trailer and newer tires on axle drives; (3) the DOT number was on the trailer; (4) the trailer was very-recently purchased; (5) there were multiple air-freshers throughout the cab; (6) Miller gave an inconsistent story regarding travel plans; (7) Miller was operating using Henderson's log book and the log book did not show the previous seven days of travel; (8) Trooper Mortensen asked for Miller's log book, but was given Henderson's without explanation; (9) Defendants traveled across county and changed trucks and companies; (10) there was a possible odor of marijuana on Miller; and (11) Defendants each had a criminal history, with Henderson's history including drug charges.  Defendants argue that Trooper Mortensen's suspicions should have been dispelled following his discovery that the semi's paperwork was valid, the trailer was recently-purchased, and Miller was in training.

Considering the circumstances presented in this case in their totality, the undersigned concludes that the officers had reasonable suspicion of criminal activity.  The overall characteristics of the trailer support a finding of reasonable suspicion. Trooper Mortensen testified that as he approached the trailer, he observed fresh or newer paint around the rear of the trailer and newer tires, indicating that the trailer was new or recently purchased.  Defendants contend that any suspicion stemming from this fact was dispelled upon Trooper Mortensen learning that the trailer was recently purchased and that the registration and insurance documents were valid.  However, the documents Defendants provided to Trooper Mortensen during the traffic stop revealed that the purchase date of the trailer was August 23, 2018—only five days before the traffic stop. Additionally, Trooper Mortensen testified that the DOT number on the trailer piqued his interest because it is not required by the Federal Motor Carrier Regulations and would have been an added expense for the company, which they normally do not do.

Defendants' travel was also suspicious. *See United States v. Steele*, No. 8:17CR113, 2017 WL 5565213, at *7 (D. Neb. Nov. 20, 2017) ("Unusual or suspicious travel plans may give rise to reasonable suspicion") (quotation omitted). Trooper Mortensen testified that, in his experience, it is uncommon to see two individuals riding in the cab of a commercial vehicle at the same time. Trooper Mortensen explained that if there are two drivers, it is normal practice for one person to sleep while the other drives because this doubles the time the truck is allowed on the road. (TR. 12, 36.) Arguably, Defendants' explanation that Miller was in training could have dispelled any suspicion stemming from this fact. However, Trooper Mortensen testified that, even when one individual is in training, it remains uncommon to see two individuals riding in the cab. Trooper Mortensen further testified that it is uncommon for individuals to travel across county and then change trucks and companies. Defendants' travel was also suspicious because Miller provided an inconsistent story regarding their travel plans. *See United States v. Bracamontes*, 614 F.3d 813 (8th Cir. 2010) (finding reasonable suspicion where the defendant changed story about his travel plans).

Moreover, Miller was operating using Henderson's log book and the log book did not show the previous seven-days of travel. Trooper Mortensen thought this was suspicious because if Miller was actually an over-the-road truck driver, he would be able to produce a log book. Even though Trooper Mortensen learned that Miller was in training, Henderson, as an experienced trucker, would have known that Miller needed his own log book. Trooper Mortensen learned that the missing days of travel was due to the two trucking companies' use of different electronic log book systems. Still, this explanation remained suspicious because drivers working for two different companies are required to indicate in their log books or logging devices that they are on duty and indicate the driving time for both companies. This was not done by Henderson or Miller. (TR. 25.) In addition, Trooper Mortensen thought it was suspicious that Defendants changed trucks and companies during their cross-country trip.

Trooper Mortensen also learned that each Defendant had a criminal history and Henderson had a prior conviction for a drug offense. Courts have concluded that prior convictions for drug offenses greatly support a finding of reasonable suspicion. *See United States v. Morales*, Case No. 19-CR-0066, 2019 WL 2357364, at *8 (N.D. Okla. June 4, 2019) (finding the defendant's prior

13

conviction for drug trafficking conspiracy weighed "heavily" in favor of finding that the officer had reasonable suspicion). There were also indicators that Defendants were attempting to mask the odor of narcotics. There were multiple air-fresheners located throughout cab of semi. Trooper Mortensen also noted the possible scent of marijuana on Miller. *United States v. Fuse*, 391 F.3d 924 (8th Cir. 2004) (finding reasonable suspicion where the defendant's car had a strong odor of air freshener, the defendant had a prior arrest, and defendant had an unusual explanation for his travel plans). All these circumstances, taken in combination, support the conclusion that officers had reasonable suspicion to believe that Defendants were engaged in criminal activity.

### 3. Reliability of Drug Dog

Defendants argue that the K-9, Amos, is unreliable. Amos was certified by the Law Enforcement Training Center on April 4, 2018. The certification provides that Amos met the Nebraska police service dog standards for detector dog – narcotics. (Ex. 101.) The certificate also certifies Trooper Potthoff as Amos' handler. This is the second certification for Trooper Potthoff. Trooper Potthoff was certified with another police service dog in 2016. (TR. 66.) Due to the Law enforcement Training Center being a bona fide organization, the Court may presume that Amos' alert provided probable cause to search the semi and trailer. *See Florida v. Harris*, 568 U.S. 237, 247-48 (2013) ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search"). In determining whether a drug detection dog is reliable, the question is whether all facts surrounding the K-9's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. *Id.*

Defendants contend that Amos is inexperienced and not fully trained. Defendants point out that Amos was first certified in April, 2018. Defendants further note that Amos only had been deployed on one previous occasion to search a semi, and that occurred on May 19, 2018. In that case, Amos indicated for drugs, but no drugs were located. Defendants also contend that Amos' performance suggests that he was not performing properly. Specifically, Defendants note that Amos was "fringing" and did not indicate to the strongest source of the odor as he was trained to

do. Defendants assert that there is no evidence that Amos has had any training to detect the odor of controlled substances in the wind, or that Amos has the ability to do so.

Exhibit 101 includes Amos' training records, his deployment reports and his certification grade sheet. Trooper Potthoff is a qualified dog handler. In 2016, Trooper Potthoff received thirteen weeks of training police service dogs. Trooper Potthoff testified that it was windy on the day of the stop and that wind can affect where dogs alert and indicate. (TR. 64.) On the day of the stop, the wind was coming from the front driver's side of the truck towards the back-passenger side of the trailer. (TR. 65.) In his testimony, Trooper Potthoff explained that "fringing" occurs when a dog alerts and indicates to an odor which would be considered away from what officers would believe to be the strongest source. (TR. 69.) Trooper Potthoff stated that the preference is that a dog indicate at the strongest source. (TR. 69.)

Trooper Potthoff testified that if a dog is not allowed to get to the strongest source of the odor, then it is allowed to fringe. (TR. 70.) Trooper Potthoff stated that, depending on the situation, fringing could be a negative attribute which results in the dog being downgraded. (TR. 70.) There are no regulations or training standards that provide how far away from a substance a dog can indicate and be considered fringing rather than falsely indicating. (TR. 71.) Trooper Potthoff testified that he believes Amos was fringing in this case. (TR. 74.) Trooper Potthoff thinks that the odor from the drugs was being carried by the wind against part of the trailer and that is where Amos pinpointed the strongest source. (TR. 74.) Trooper Potthoff further testified that there were obstructions between Amos and the strongest source. Trooper Potthoff stated that the air foils underneath the trailer, the ribbing underneath the trailer, the tires, axles, all of this could catch odor to where Amos would pinpoint that as the strongest source. (TR. 74.)

Trooper also testified about what a "sent cone" is, which is the strongest source and narrowest portion of the cone. (TR. 75.) In this case, the strongest source of odor in the beginning of the scent cone would have been in the cab of the truck. (TR. 75.) Trooper Potthoff testified that if scent cone is blowing in a way that is away from the cab of the truck, then Amos may not alert or indicate to the presence of odor there until he is able to actually enter the sent cone. (TR. 76.) Trooper Potthoff testified that Amos was not in active search mode when he was on the side

of the passenger cab. Trooper Potthoff intended to go all the way around the truck and go back to the cab again. (76-77.) Trooper Potthoff further testified that because he was relying upon wind as an environmental factor, that excused the dog's failure to indicate near the cab. Trooper Potthoff, as a properly trained and qualified dog handler, was cognizant of the wind and its direction at the time he performed the search. (TR. 77.) Trooper Potthoff further testified that through his training and experience, and the factors present, Amos detected the odor of contraband in the wind. (TR. 77.)

The training records indicate that Amos' progress up until he was certified. The certified grade sheet was addressed by Defendants' counsel. The grade sheet shows that a grading of number 1 indicates the best performance and a grading of 6 indicates the worst. (TR. 83-84.) The grade sheet reflects that fringing is considered a number 2. Therefore, within the certification process, fringing is not a significant deduction. It appears Amos fringed on several occasions during certification, but he still passed and was certified. (Ex. 101.)

Amos was a newer K-9 at the time of his deployment in this case. He was certified in April, 2018. Since being certified, Amos has been involved in regular training, as well as deployments. Amos' training records show that he is able to detect the order of narcotics and has improved his proficiency through training. Amos' deployment records show he has been able to find very small amounts of drugs, such as edibles and THC, in infused lotion. While Amos has alerted and indicated on several occasions in which no narcotics were found, several of these incidents involved known drug users with their items being in the vehicle or apartment. The Supreme Court has indicated that emphasis should be placed on a dog's performance in a controlled setting, rather than its performance in the field. *See Harris*, 568 U.S. 244-47. The Supreme Court in *Harris* stated that if a dog alerts to a car in which no narcotics is found, it may not have made a mistake. *Harris*, 568 U.S. at 245. Rather, "[t]he dog may have detected substances that were too well hidden or present in qualities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person." *Id*. at 245-46. In short, neither the records nor the testimony shows that Amos is unreliable. Thus, Amos' alert and indication provided probable cause to search the semi and trailer in this case.

16

Accordingly,

**IT IS HEREBY RECOMMENDED** to Senior United States District Court Judge Laurie Smith Camp that the motions to suppress (Filing Nos. 27 and 34) be denied.

Dated this 19th day of June, 2019.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.