## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiffs,** | **8:18CR312** |
| **vs.** | |
| LAWRENCE HENDERSON, and KENDALL MILLER, | **MEMORANDUM AND ORDER** |
| **Defendants.** | |

This matter is before the Court on the Findings and Recommendation (F&R), ECF No. 55, issued by Magistrate Judge Susan M. Bazis. The Magistrate Judge recommended that the Motions to Suppress filed by the Defendants Kendall Miller, ECF No. 27, and Lawrence Henderson, ECF No. 34, be denied.  Both Defendants filed Objections to the F&R, ECF Nos. 56, 58, as allowed by 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a).  The Government responded to the Objection, ECF No. 60.  For the reasons set forth below, the F&R will be adopted, and the Motion to Suppress will be denied.

### BACKGROUND

Defendants are charged with possession with intent to distribute methamphetamine, cocaine, and marijuana. Indictment, ECF No. 1.  Defendants seek to suppress any evidence obtained by law enforcement on August 28, 2018, asserting that Nebraska State Patrol Trooper Samuel Mortensen lacked probable cause to stop Defendants' vehicle, impermissibly interrogated Defendants, extended the traffic stop in order to conduct a dog sniff, and lacked probable cause to search Defendants' vehicle. Neither Defendant directly objected to the Magistrate Judge's factual findings.  Having

reviewed the record, the Court adopts those findings and provides the following by way of summary:

On August 28, 2018, Trooper Mortensen was traveling west on I-80 in Hall County, Nebraska, when he observed a white semi pulling a white trailer traveling east. Trooper Mortensen observed two individuals in the semi which, in his experience, is uncommon. As the semi passed, Trooper Mortensen observed that trailer did not have a license plate, so he turned his cruiser around and initiated a traffic stop.

As he approached the semi, Trooper Mortensen observed that the rear of the trailer displayed the company name, DOT number and MC number. Trooper Mortensen testified that these markings are uncommon because they are not required by the Federal Motor Carrier Regulations and would have been an added expense for the company to put that marking on the trailer. Trooper Mortensen also noticed a temporary tag where the license plate should have been and fresh or new paint around the rear of the trailer and around the axles.  This led Trooper Mortensen to believe that the trailer was new or recently-sold.

Henderson was seated in the passenger's seat and Miller was in the driver's seat. Trooper Mortensen advised Defendants of the reason for the stop and asked to see the registration documents for the semi as wells as Miller's driver's license. As he made these requests, Trooper Mortensen noticed several pine-tree-style air-fresheners throughout the cab of the semi. Defendants produced the registration, lease agreements, and insurance information. The documents revealed that the purchase date of the trailer was August 23, 2018.

Trooper Mortensen informed Defendants he was going to perform a level two inspection—a type of walk-around inspection of a commercial vehicle. Trooper Mortensen testified that it is his general practice to do a level 2 or 3 inspection whenever he stops a commercial vehicle. After he completed the level 2 inspection, Trooper Mortensen told Defendants he was going to prepare an inspection report, and asked Miller to accompany him to his cruiser.

As Miller exited the semi, Trooper Mortensen requested Miller's electronic log book. The log book showed several days of off-duty time prior to August 25, 2018, when the drive-time began. He noted that there was a significant amount of down time in the Salt Lake City, Utah, area. Trooper Mortensen also noticed that there was a short amount of on-duty driving time before there was off-duty time again, and then it showed driving from Salt Lake City to the North Platte area.

After Trooper Mortensen examined Miller's log book, he asked Henderson about their trip. Henderson told him that they were coming from California. Henderson said they had dropped part of a load in Salt Lake City and that they were headed to drop the remainder of the load in Ohio. Henderson provided Trooper Mortensen with his driver's license and offered to show Trooper Mortensen what was in the trailer.

After his conversation with Henderson, Trooper Mortensen returned to his cruiser with Miller.  In the cruiser, Trooper Mortensen began to examine the paperwork and run background checks on Defendants. Trooper Mortensen learned that Miller had a valid commercial driver's license out of Ohio.  He also learned that Miller had a criminal history for assault and that Henderson had a prior drug charge.

While in the cruiser, Trooper Mortensen asked Miller for further details about their trip. Miller told Trooper Mortensen that they picked up the load in California, but he could not recall exactly where, and said they were taking the load to Columbus, Ohio. Miller told Trooper Mortensen that this was his first trip for the company. Trooper Mortensen asked Miller if they had taken a load to California, and Miller said they had not. Trooper Mortensen asked how they arrived in California, and Miller corrected himself and said that they had taken a load to California with a different truck. Trooper Mortensen thought this was significant because, in his experience, it is not common practice to change trucks. Trooper Mortensen further testified that during their discussion, he thought he could smell the odor of burnt marijuana on Miller. Trooper Mortenson stated that Miller remained calm and relaxed and answered all questions.

After his discussion with Miller, Trooper Mortensen left the cruiser to return Henderson's license and again asked Henderson about their travel plans. Henderson told Trooper Mortensen that they had driven a different truck to California with a different load, and then had changed companies. Henderson explained that he did not have any prior driving time on his log book because the other company that he drove for had a different log book system.

Trooper Mortensen then returned to the cruiser to complete the inspection report. He returned Miller's paperwork and told Miller he was free to go. At that point, according to Trooper Mortensen, the purpose of the traffic stop was complete. As Miller was exiting the cruiser, Trooper Mortensen asked Miller if there was anything illegal in the semi and if he was still willing to consent to him looking inside the trailer. Miller told Trooper Mortensen that he was just the driver and he had to ask Henderson for consent

4

to search. Trooper Mortensen told Miller to wait in the cruiser while he went to speak to Henderson. Trooper Mortensen acknowledged that Miller was not free to leave at that point.

Around this time, Trooper Matt Adams arrived on the scene. As Trooper Mortensen left the cruiser to speak to Henderson, he asked Trooper Adams to talk to Miller to see if he could smell marijuana. Trooper Mortensen then asked Henderson for consent to search the semi and trailer. Trooper Mortensen explained that he had several suspicions and, based on his experience, the circumstances of the trailer and their documents were consistent with a criminal enterprise.

Henderson acknowledged that the trailer was just picked up and was new, but that he had gone coast to coast in the semi. Henderson explained he was going back to California to get the license plate and, since they had all their paperwork, he did not understand why this was a concern. Henderson indicated he wanted to head down the road. Henderson further stated that he did not think there was probable cause to search the semi. Trooper Mortensen admitted that he did not have probable cause and that was why he was asking for consent to search. At that point, Henderson gave Trooper Mortensen consent to search the trailer, but not the cab of the semi.

Trooper Mortensen had Henderson exit the semi, requested a K-9 through dispatch, and then conducted a search of the trailer. The search of did not uncover any contraband. After the search, Trooper Mortensen informed Henderson that he was going to prepare a receipt for the search. He also told Henderson that a K-9 was going to come to double-check the trailer.

Miller was still in the cruiser when Trooper Mortensen returned to prepare the receipt. As he was completing the receipt, Trooper Mortensen used the computer in his cruiser to see how long it would be before the K-9 arrived. Once the receipt was complete, Trooper Mortensen returned Miller's documents and provided him with a copy of the receipt to sign.  As Trooper Mortensen was preparing to scan the signed receipt, he noticed that the log book he examined belonged to Henderson, not Miller. Trooper Mortensen requested Miller's log book. Miller stated that he did not have one and was operating under Henderson's book. Trooper Mortensen testified that this constituted a false log and was an out-of-service violation. Trooper Mortensen thought this was suspicious because if Miller was an over-the-road truck driver, he would have a log-in or be able to produce some sort of log device.

Trooper Mortensen left the cruiser and explained the log book issue to Henderson. Trooper Mortensen told Henderson that he needed to drive, and that Miller had to create a profile on the logging device before he drove again. Trooper Mortensen also informed Henderson that he was not going to issue a citation or violation for the logging device because he understood Miller was training.

As Trooper Mortensen spoke with Henderson, Trooper Brent Potthoff arrived on the scene with his K-9, Amos. Trooper Mortensen told Trooper Potthoff that he had some indicators of criminal activity and that he was granted consent to search the trailer but not the semi. Trooper Mortensen directed Trooper Potthoff to run Amos around the entire vehicle but to focus on the cab area of the semi.

Amos alerted to the odor of narcotics around the driver's side back of the trailer and continued to alert toward the front of the rear tires about halfway up the passenger

6

side of the trailer before he indicated to the odor of narcotics. Trooper Potthoff testified that it was windy that day and that the wind was coming from the front driver's side of the semi towards the rear passenger's side of the trailer. Trooper Potthoff stated that wind can affect where dogs alert and indicate to odors.

Trooper Potthoff explained that K-9s are trained to indicate at the strongest source of the odor. When a K-9 does not indicate to the strongest source, this is referred to as "fringing." Trooper Potthoff testified that he believed Amos was fringing when he ran around the semi. Trooper Potthoff stated that he believed the odor from the drugs was being carried by the wind against a part of the trailer, and that is why Amos indicated in that area.

After Amos alerted, Trooper Potthoff told Trooper Mortensen that he had probable cause to search. Trooper Mortensen searched the semi cab and found several packages of marijuana and several kilo-sized packages of white unknown powder. The packages tested positive for cocaine and methamphetamine.

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a), the Court shall make a *de novo* review of the portions of the Magistrate's Findings and Recommendation to which objections have been made. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings and recommendations. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

## DISCUSSION

The Magistrate Judge concluded that Trooper Mortensen had probable cause to stop the semi, reasonable suspicion to detain Defendants, and that Amos's alert

7

provided probable cause to search. Both Defendants object to the Magistrate Judge's conclusion that Trooper Mortensen had consent and/or reasonable suspicion to detain them to wait for Amos. Henderson also argues that Amos's alert did not provide probable cause to search the semi.

## I. Length of Stop and Reasonable Suspicion

Defendants argue that Trooper Mortensen unlawfully prolonged the traffic stop and lacked reasonable suspicion to detain them until the K-9 arrived. Based on a thorough review of the record, the encounter leading to the search began as consensual, and Trooper Mortensen had reasonable suspicion to detain Defendants briefly to conduct a dog sniff.

### A. Consensual Encounter with Miller

Defendants argue that the Magistrate Judge erred in concluding that Trooper Mortensen's encounter with Miller was consensual. However, as this Court has previously recognized, "[i]f an encounter with police becomes consensual after a traffic stop is complete, 'it is not a seizure, the Fourth Amendment is not implicated, and the officer is not prohibited from asking questions unrelated to the traffic stop or seeking consent to search the vehicle.'" *United States v. Fernandez*, No. 8:16CR270, 2017 WL 543192, at *4 (D. Neb. Feb. 10, 2017) (quoting *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010)). In the absence of evidence of coercion, a request for permission to search a vehicle after the stop has concluded does not violate the Fourth Amendment. *See Munoz*, 590 F.3d 916, 921; *see also United States v. Valle Cruz*, 452 F.3d 698, 706 (8th Cir. 2006) (Officer's "comment to [defendant] to 'sit tight' when taken in context was not the sort of 'physical force or show of authority' that would have

converted the counter into a seizure."), *United States v. Grant*, 696 F.3d 780, 785 (8th Cir. 2012) (quoting *United States v. Vera*, 457 F.3d 831, 835 (8th Cir. 2006)) ("There is 'a constitutionally significant distinction between an official command and a request that may be refused.'")

As the Magistrate Judge noted, the Eighth Circuit analyzed similar facts in *Munoz*. In *Munoz*, an officer stopped a vehicle that had been rented by the passenger, Smith, but driven by the defendant, Munoz. 590 F.3d at 319. The officer asked Munoz to sit in the cruiser while the officer completed the stop. *Id*. After completing the purpose of the stop, the officer asked Munoz if the officer could search the vehicle. *Id*. Munoz told the officer that he should ask Smith because she had rented the vehicle. *Id*. In response, the officer told Munoz to remain in the cruiser while the officer asked Smith's permission to search. *Id*. The Eighth Circuit held that Munoz's direction to ask the passenger indicated Munoz was allowing the encounter to continue. *Id*. Because there were no other signs of coercion, the officer's direction to remain in the cruiser while he spoke to Smith "did not turn the consensual encounter back into a seizure." *Id*.

Trooper Mortensen admitted that when he returned Miller's documentation, the traffic stop was completed. However, as in *Munoz*, Trooper Mortensen then asked for permission to search the vehicle. Miller did not refuse and there is no evidence that he attempted to end the encounter. Instead, Miller stated that Trooper Mortensen would need to ask Henderson for permission to search. As in *Munoz*, Miller's direction to ask Henderson for permission to search "indicat[ed] that he was allowing the continuation of the encounter." *See id*. at 921. Trooper Mortensen's direction that Miller remain in the cruiser was not accompanied by a show or threat of force. Thus, as in *Munoz*, Trooper

Mortensen's direction that Miller remain in the cruiser did not turn the consensual encounter into a seizure.

### B. Reasonable Suspicion to Continue the Stop

Under the Fourth Amendment, "an officer conducting a traffic stop who discovers information leading to reasonable suspicion of an unrelated crime may extend the stop and broaden the investigation." *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016). "After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016) (quoting *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013). These tasks may involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

Absent reasonable suspicion, an officer may not broaden the investigation "'beyond the time reasonably required to complete the mission' of issuing a warning ticket." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (quoting *Illinois v. Caballes*, 543 U.S. at 407). A dog sniff, for example, "is a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* (citations and quotations omitted). The

10

reasonableness of the length of a traffic stop and a resulting detention are fact-based questions, and a traffic stop is not subject to a defined limit. *United States v. Riley,* 684 F.3d 758, 765 (8th Cir. 2012). Accordingly, detention "beyond completion of the traffic infraction investigation" must be supported by "reasonable suspicion of criminal activity." *Rodriguez,* 135 S. Ct. at 1616-17.

In order to establish reasonable suspicion, "'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' further investigation." *Woods*, 829 F.3d at 679 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Although some factors may appear innocent when considered alone, "a combination of factors may give rise to reasonable suspicion." *United States v. Briasco*, 640 F.3d 857, 860 (8th Cir. 2011). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998) (quoting *United States v. Halls*, 40 F.3d 275, 276 (8th Cir. 1994)). "However, in order to measure the totality of the circumstances, it is necessary to first break the reasonable suspicion into separate observations." *United States v. Johnson*, No. 8:16CR241, 2017 WL 933044, at *5 (D. Neb. Mar. 9, 2017) (quoting *Beck*, 140 F.3d at 1137-39 (analyzing each observation separately before combining them in a totality of the circumstances test)).

Based on the totality of the circumstances, Trooper Mortensen had reasonable suspicion to detain Defendants while the K-9 arrived on scene. The Magistrate Judge

broke down the justification for Trooper Mortensen's suspicion into separate observations, stating that he observed:

> (1) two individuals were riding in the cab of the semi; (2) there was fresh or newer paint around the rear of trailer and newer tires on axle drives; (3) the DOT number was on the trailer; (4) the trailer was very-recently purchased; (5) there were multiple air-[fresheners] throughout the cab; (6) Miller gave an inconsistent story regarding travel plans; (7) Miller was operating using Henderson's log book and the log book did not show the previous seven days of travel; (8) Trooper Mortensen asked for Miller's log book, but was given Henderson's without explanation; (9) Defendants traveled across county and changed trucks and companies; (10) there was a possible odor of marijuana on Miller; and (11) Defendants each had a criminal history, with Henderson's history including drug charges.

F&R at 12, ECF No. 55.  These observations taken together, in Trooper Mortensen's experience, suggested potential drug-related activity.

Defendants attempt to discredit the Magistrate Judge's recommendation by explaining why each finding fails to support a suspicion of criminal activity.  Defendants take particular issue with the conclusion that Miller and Henderson's accounts of their travel plans were inconsistent.  Miller had initially told Trooper Mortensen that they had not taken a load to California but then corrected himself and said they took the load in a different truck.  Regardless of whether the Defendants' accounts were consistent, Trooper Mortensen noted that it was unusual to change trucks.  "[U]nusual or suspicious travel plans may give rise to reasonable suspicion."  *Beck*, 140 F.3d at 1139 (citing *United States v. Wood*, 106 F.3d 942, 946–47 (10th Cir. 1997) (noting that "unusual travel plans may provide an indicia of reasonable suspicion.").  When combined with Trooper Mortensen's other observations, and for the reasons stated in the F&R, the

Court concludes that Trooper Mortensen had reasonable suspicion to detain Defendants briefly to conduct a K-9 sniff.[1]

## II. Validity of the K-9 Sniff

The Supreme Court in *Florida v. Harris*, 568 U.S. 237 (2013), outlined the framework for determining whether a dog sniff-search is reliable. The Court stated that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris*, 568 U.S. at 246-47. "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Id.* at 247. However, the defendant must be given the opportunity to contest "such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Id.* In determining whether a search dog's alert or indication was reliable enough to provide probable cause to conduct a search, the appropriate inquiry "is whether all facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 1058.

---

[1] Because Trooper Mortensen had Miller's consent to ask Henderson for renewed permission to search the trailer, Mortensen may not have needed further suspicion to detain them. After leaving Miller in the cruiser, Trooper Mortensen sought permission to search the semi and the trailer from Henderson. Henderson eventually gave permission to search the trailer. After searching the trailer, Mortensen prepared a receipt of the search for Miller and at that time noticed that the log book belonged to Henderson, not Miller. The K-9 arrived as Trooper Mortensen discussed the log book violation with Henderson. There is no evidence that Mortensen prolonged the search of the trailer or contrived the log book violation to give more time for the K-9 to arrive.

Defendants argue that, even if detention was reasonable, Trooper Mortensen lacked probable cause to search the cab of the semi because the K-9's certification was unreliable and the K-9 was improperly deployed.

### A. Amos's Certification

Henderson argues, for the first time in his Objection, that the Nebraska Law Enforcement Training Center is not a bona fide dog training organization under *Florida v. Harris*. A defendant may overcome the presumption that "[a] dog's alert provides probable cause to search" if he "can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surround a canine alert undermined the case for probable cause." *United States v. Gonzales*, 781 F.3d 422, 429-30 (8th Cir. 2015).

Henderson failed to demonstrate the inadequacy of Amos's certification at the evidentiary hearing. In evidence at the hearing were Certification of Completion of training for Trooper Potthoff and Amos (Ex. 101 at 1), the training records (*id.* at 2-21), Amos's deployment records (*id.* at 22-31), and the Certification Grade Sheet (*id.* at 32-33) in discovery. There is no dispute that Defendants had access to these records. At the hearing, Henderson did not challenge testimony that Amos and Amos's handler were qualified. Because Henderson had the opportunity to challenge the presumption that the training center was bona fide but failed to do so, the Court declines to consider this argument raised for the first time. *See United States v. Caskey*, No. CRIM. 11-301 JRT/LIB, 2013 WL 50450, at *6 (D. Minn. Jan. 3, 2013) (quoting *Ridenour v. Boehringer Ingelheim Pharm., Inc.*, 679 F.3d 1062, 1067 (8th Cir. 2012) ("The Eighth Circuit has

14

held, in no uncertain terms, that a party is 'required to present all of his arguments to the magistrate judge, lest they be waived.'").

### B.  Reliability of Amos's Indication

Henderson also objects to the Magistrate Judge's conclusion that Amos's indication was reliable.  However, the evidence showed Amos's satisfactory performance in numerous training and certification programs.  *See* Tr. 63, 83-84.  Trooper Potthoff and Amos were certified as an acceptable canine team according to the Nebraska standards in April, 2018. Ex. 101 at 32.  Ample evidence supports a conclusion that Amos and Trooper Potthoff were qualified to conduct a sniff.

Henderson also objects to the Magistrate Judge's conclusion because Amos indicated at the trailer, not the cab of the semi.  However, Trooper Potthoff explained that to determine the source of the odor, he needed to factor the effect of the wind on Amos's indication.   Potthoff testified that wind "could affect where the dog alerts and indicates to an odor because of where the scent cone of that -- the source of the odor puts it, I guess. Where the -- where the odor from the source actually blows for the dog to encounter that." Tr. at 64-65.  Based on Trooper Potthoff's training and experience, he believed Amos detected the odor of contraband in the wind that was blowing from the front driver's side of the cab back toward the rear passenger's side of the trailer.  The Court concludes that the Magistrate Judge did not err in relying on Trooper Potthoff's testimony, and finding that Amos's alert provided sufficient probable cause.

### CONCLUSION

For the reasons discussed, the Findings and Recommendation will be adopted, and the Motion to Suppress will be denied.

IT IS ORDERED:

1.      The Findings and Recommendation, ECF No. 55, are adopted in their entirety;

2.      The Motions to Suppress filed by the Defendants, ECF Nos. 27 and 34, are denied;

3.      Defendants' Objections to the F&R, ECF Nos. 56 and 58, are overruled; and

4.      The Clerk of Court is directed to terminate the Government's Response, ECF No. 60.


Dated this 19th day of August, 2019.


                              BY THE COURT:

                              s/Laurie Smith Camp
                              Senior United States District Judge